USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  01/27/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                    :
MICHAEL CORDERO ROMERO,                                             :
                                                                    :
                                    Plaintiff,                      :          1:25-cv-2857-GHW
                                                                    :
              -v-                                                   :     MEMORANDUM OPINION &
                                                                    :              ORDER
GOLDMAN SACHS BANK USA,                                             :
                                                                    :
                                    Defendant.                      :
                                                                    :
------------------------------------------------------------------ X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

Goldman Sachs Bank USA ("Goldman") locked Michael Cordero Romero out of his savings

account.  For several months, he did not have access to funds he needed to pay his daily expenses,

including those associated with the care of his elderly mother.  After Mr. Cordero filed this lawsuit,

Goldman restored Mr. Cordero's access to his account.

Though he had access to his funds, Mr. Cordero continued to pursue his claims in a quest to

hold Goldman accountable for its decision to temporarily freeze his account.  Goldman moved to

compel Mr. Cordero to arbitrate his claims pursuant to an arbitration provision of a Deposit

Account Agreement to which it argues Mr. Cordero agreed (the "DAA").  In support of its

argument that Mr. Cordero manifested assent to the DAA, Goldman relies on screenshots of

webpages it asserts Mr. Cordero "would have seen" during his sign-up process and internal records

that it argues reflect that he did accept the DAA.  In several sworn affidavits, Mr. Cordero denies

ever having agreed to the DAA when he opened his account and specifically denies having seen any

screen where he would have clicked any button manifesting assent to the DAA.

Because Goldman's evidence does not overcome Mr. Cordero's affirmations that he never

agreed to the DAA in the manner Goldman argues he did, there is a genuine dispute of material fact

as to whether Mr. Cordero and Goldman entered an arbitral agreement.  For that reason, the Court

DENIES Goldman's motion to compel arbitration and its request to stay the case pending

arbitration.  The Court must hold a trial to resolve the question of whether the parties entered an

arbitration agreement.

## II.    BACKGROUND[1]

### A.    Factual Background

In January 2025, Michael Cordero Romero, a German citizen living in Oklahoma, opened a

Marcus personal savings account with Goldman Sachs.[2]  Amended Compl. ¶ 1.  When he applied

for the account, he was prompted to call Goldman to verify his identity.  Dkt. No. 122 ¶ 5 ("Third

Anderson Decl."); Dkt. No. 136 ¶ 3 ("Sur-reply Decl.").  After his identity was verified, Goldman

asserts, Mr. Cordero was required to consent to various agreements as a condition of opening his

account, including the DAA.  Third Anderson Decl. ¶ 7.  The DAA includes a prominent message

stating that Section XII of the agreement (the "Arbitration Provision") "requires claims to be

arbitrated . . . unless you exercise your right to reject arbitration under Section XII.5 by phone or

mail within ninety (90) days after account opening."  Dkt. No. 24-3 at 1 ("DAA").  The Arbitration

Provision states that either the bank or the accountholder "may elect to resolve any Claim by

individual binding arbitration."  *Id.* at 17.  The DAA defines "Claim" as "any current or future claim,

dispute, or controversy relating in any way to this Agreement or your Accounts, except for the

validity, enforceability, or scope of the arbitration provision."  *Id.* at 16.  The DAA does not specify

---

[1] The facts are drawn from Plaintiff's amended complaint, Dkt. No. 29 ("Amended Compl."), and the affidavits, declarations, and other written materials that are appended to both Plaintiff's complaint and the parties' memoranda of law in connection with Defendant's motion to compel arbitration.  Many of the key facts—what Mr. Cordero saw on Goldman's website when he opened his account and what he did or did not click on—are in dispute.  For purposes of this section, any fact that is disputed is framed as one party's representation or assertion of the facts, rather than as a fact that the Court has found.  Undisputed facts are stated without such a qualification.
[2] "Marcus by Goldman Sachs" is the brand name of Goldman Sachs Bank USA.  The account Mr. Cordero opened was branded with the "Marcus" brand.

the rules that govern any arbitration, and allows claims to be heard by JAMS, AAA, or another organization upon the parties' written agreement. *Id.* at 17.

The parties dispute the sequence of events that led to Mr. Cordero opening his account. Goldman represents that Mr. Cordero was presented with a screen that directed him to "review and accept" the agreements that were hyperlinked and required Mr. Cordero to click "I acknowledge the receipt of and agree to the Deposit Account Agreement . . ." to complete the account creation process. Third Anderson Decl. ¶ 7. At first, Goldman contended that Mr. Cordero saw one set of screens while signing up on Goldman's website. Dkt. No. 65 ¶ 7 ("Second Anderson Decl."). Following discovery, Goldman changed their account of Mr. Cordero's application process and instead asserted that Mr. Cordero saw a different screen directing him to assent to the DAA after he clicked on a link in an email that they assert he received following the phone call Mr. Cordero made during his account signup process. Third Anderson Decl. ¶¶ 5–7. Mr. Cordero does not dispute that he received such an email, but he asserts that he was never presented with any screen with the DAA, and that he did not click any acknowledgement of receipt or agreement to the DAA. Sur-reply Decl. ¶¶ 4–5.

Following the creation of his account, approximately $15,000 was deposited into the account. Amended Compl. ¶ 2. On February 19, 2025, he was blocked from accessing his account. *Id.* ¶ 3. He attempted to resolve the issue by calling Goldman, and he spoke to several Marcus representatives over the course of two months. *Id.* ¶ 4. Goldman sent him a form with which he could verify his identity, and Mr. Cordero remitted a signed and notarized version of the form (the "Affidavit of Identity") in March 2025. *Id.* ¶¶ 5–6. Goldman did not accept that submission. *Id.* ¶ 7. The loss of access to his funds prevented him from paying for his daily expenses, including medical care for his elderly mother. Dkt. No. 61 at 24:11–19 ("Tr."). Mr. Cordero filed this lawsuit on April 3, 2025, seeking to gain access to his funds. Dkt. No. 1 at 7.

By April 10, 2025, Mr. Cordero's access had been restored, and he was able to withdraw funds and transfer them to a linked account. Amended Compl. ¶¶ 10–11. Goldman once again restricted Mr. Cordero's ability to transfer funds out of his account and Marcus representatives with whom Mr. Cordero spoke over the phone told him that his use of his Marcus account in connection with a linked business account violated the DAA. *Id.* ¶¶ 12–13. The DAA states that "[a]ccounts may only be used for personal, family, or household purposes, and cannot be opened or maintained for business purposes." DAA at 1. That hold was brief, however, as by the date of the April 25, 2025 hearing held by the Court in connection with Plaintiff's application for a preliminary injunction, counsel for Goldman affirmed that there were no continuing restrictions on Plaintiff's account. Tr. at 25:15–25.

Mr. Cordero argues that the freeze of his account was unlawful. Amended Compl. at 1. He also argues that Goldman's refusal to accept Plaintiff's Affidavit of Identity was "discriminatory" and "abusive" conduct. *Id.* ¶ 18. A Marcus representative stated that the Affidavit was rejected because it included a physical notary signature for a remote notarization. *Id.* ¶ 7. Mr. Cordero argues that this was invalid because the notarization—by a Wyoming notary—was done in full compliance with Wyoming law. *Id.* ¶ 8. Goldman did not identify any reason for the account freeze. *Id.* ¶ 19. Mr. Cordero asserts that the freezing of his funds caused "financial losses" and "emotional distress." *Id.* at 14.

### B.    Procedural History

#### i.    Prior Proceedings

Plaintiff, proceeding *pro se*, filed his initial complaint on April 3, 2025. Dkt. No. 1. On April 3, 2025, he filed a request to proceed *in forma pauperis*—*i.e.*, without paying the filing fee. Dkt. No. 2. Chief Judge Laura T. Swain, to whom this case was assigned, granted that request on April 9, 2025. Dkt. No. 10. Mr. Cordero asserted causes of action under four federal statutes: the Equal Credit

Opportunity Act, the Consumer Financial Protection Act, the Expedited Funds Availability Act, and the Bank Secrecy Act. Dkt. No. 1 ¶¶ 16–23. He sought the release of his funds, compensatory damages, and punitive damages. *Id.* at 7–8.

Mr. Cordero moved for a preliminary injunction and a temporary restraining order. Dkt. Nos. 6–7, 15–16. Mr. Cordero requested that the Court order Goldman to unfreeze his account or, in the alternative, to return the amount in the account. Dkt. No. 6-1. He argued that he had met the requirements for preliminary injunctive relief. Dkt. No. 6. First, he argued that he was likely to succeed as to his federal causes of action. *Id.* at 2–3.[3] He argued that he suffered irreparable harm because he did not have access to funds needed for "basic living expenses, including food, housing, and medical care," causing "[e]motional distress, anxiety, and financial instability." *Id.* at 3. For the same reason, he argued that the balance of equities tipped in his favor. *Id.* at 4. He also argued that there is "a clear public interest in ensuring that financial institutions do not arbitrarily or discriminatorily restrict access to consumer accounts without due process or regulatory compliance." *Id.* at 4.

On April 10, 2025, the Court held that Plaintiff had not met the requirements of Federal Rule of Civil Procedure 65(b)(1)(A) for issuing a temporary restraining order without notice but ordered Defendant to show cause why the Court should not order the preliminary injunctive relief as requested by Plaintiff. Dkt. No. 12.

On April 22, 2025, Goldman filed a brief in opposition to Mr. Cordero's motion for injunctive relief. Dkt. No. 26. Defendant argued that Plaintiff's access to his funds was restored on April 10, 2025, and that as a result the motion for injunctive relief was moot. *See generally id.*

---

[3] In his motion papers, Plaintiff also asserted that he is likely to succeed on the merits of a claim that Goldman violated the implied covenant of good faith and fair dealing. Dkt. No. 6 at 13. This claim was not in the operative complaint at the time of filing. *See generally* Dkt. No. 1.

On April 25, 2025, the Court held a hearing on the motion for preliminary injunctive relief. Tr.  In a colloquy with the Court, counsel for Goldman affirmed that Plaintiff had unrestricted access to his account. *Id.* at 14:4–9.  Finding that the record demonstrated that Mr. Cordero had access to his account, the Court held that Plaintiff had not sufficiently shown irreparable harm to justify preliminary injunctive relief. *Id.* at 25:15–25, 26:1–3.  The Court also held that no discovery was needed on the issue of irreparable harm. *Id.* at 26:4–12; *see also* Dkt. No. 28 (Plaintiff's request for discovery in connection with the preliminary relief).  The Court accordingly denied the motion for a preliminary injunction.  Though he indisputably had full access to his funds, Mr. Cordero objected to both rulings.  The Court subsequently denied Mr. Cordero's motions to reconsider its decision to deny Mr. Cordero injunctive relief or discovery in connection with his motion for preliminary relief.  Dkt. Nos. 42, 48.

### ii.        The Motion to Compel

On April 22, 2025, Defendant moved to compel arbitration and to stay this case during the arbitration proceedings.  Dkt. No. 24.  Goldman's motion was premised on the existence of a valid and enforceable agreement—the DAA—containing an agreement to arbitrate—the Arbitration Provision.  Dkt. No. 24-1 at 6 ("Mot.").  Goldman argued that the pending action constituted a controversy within the scope of the Arbitration Provision. *Id.*  Defendant first argued that under the Federal Arbitration Act (the "FAA"), courts must enforce the agreement of the parties to arbitrate, pursuant to the Arbitration Provision. *Id.* at 7–8.  Goldman then argued that the DAA was a valid agreement because Goldman provided Mr. Cordero with the DAA when the account was opened. *Id.* at 8.  Goldman also argued that Mr. Cordero's use of the account constituted acceptance of the DAA. *Id.*  Goldman next argued that Mr. Cordero's claims were encompassed within the scope of the Arbitration Provision. *Id.* at 9–11.  Finally, Goldman argued that the action should be stayed pending the completion of the arbitration under the FAA. *Id.* at 11–12.  In support of its motion,

Goldman filed a declaration by Chelsea Anderson, a Vice President of Fraud & Disputes Operations at Goldman. Dkt. No. 24-2 ("First Anderson Decl."). In it, Ms. Anderson affirmed that Goldman "would not have opened the Account had Plaintiff not accepted the Deposit Account Agreement." *Id.* ¶ 5. She also affirmed, based on her review of Goldman's records, that Mr. Cordero had not opted out of arbitration. *Id.* ¶ 7.

Mr. Cordero filed his opposition on May 28, 2025. Dkt. No. 52 ("Opp."). First, he argued that a valid arbitration agreement did not exist because he did not assent to the Deposit Account Agreement at any point during the process of signing up for his account. *Id.* at 1–2. In support of this argument, Mr. Cordero filed an affidavit in which he affirmed that he was "never presented with the Deposit Account Agreement (DAA) for review, nor was [he] required to agree to it through any mechanism of assent, such as a signature, checkbox, or e-consent." Dkt. No. 53 ¶ 3 ("Opp. Aff."); *see also id.* ¶¶ 4–5. He argued that the DAA was not an enforceable agreement to arbitrate because he had no actual or constructive notice of the terms of the DAA because the agreement was not presented to him during the process of signing up for his account. Opp. at 8–11. He also argued that his use of his Marcus account did not constitute assent to the DAA. *Id.* at 6–7. Mr. Cordero also argued that the Court need not reach Defendant's arguments concerning the validity of the arbitration clause or its scope because there was no agreement to arbitrate in the first instance. *Id.* at 19–26. Finally, he argued that even assuming the agreement was valid, the arbitration clause was unenforceable, either because he would be unable to effectively vindicate his statutory rights in arbitration or because the Arbitration Provision was unconscionable. *Id.* at 26–33. Mr. Cordero argued that, in the alternative, the filing of this lawsuit within 90 days of the opening of his account constituted his opt-out of arbitration within the meaning of the Arbitration Provision. *Id.* at 15–19.

On June 23, 2025, Defendant filed its first reply. Dkt. No. 64 ("Reply"). Goldman argued that a valid agreement to arbitrate existed, and there was no genuine dispute of material fact as to

whether Mr. Cordero had assented to the DAA. *Id.* at 8–10. Alongside its reply, Goldman filed another declaration from Ms. Anderson to support its position. Dkt. No. 65 ("Second Anderson Decl."). Attached to that declaration were screenshots that Ms. Anderson affirmed were an "exemplar online application workflow for the Marcus by Goldman Sachs Online Savings Account that Plaintiff would have seen when he applied for the Account in January 2025." *Id.* ¶ 5; Dkt. No. 65-1 ("Airpods Flow"). The screenshots showed what appeared to be a fictitious user signing up for a Marcus account and included a screen that prompts a user to "acknowledge receipt of and agree[ment] to the Deposit Account Agreement . . . ." Airpods Flow at 4. Significantly, Ms. Anderson did not affirm that the screenshots were what Mr. Cordero actually saw. Goldman also argued that Mr. Cordero's pleading of a cause of action for breach of the DAA in his Amended Complaint and his reference to the DAA at the April 25, 2025 hearing were "fatal" to his challenges to the DAA. Reply at 8. Goldman next argued that Plaintiff had not met his burden to demonstrate unconscionability. *Id.* at 10–12. Goldman then argued that the DAA provided for two exclusive methods to opt out of arbitration—calling a specific number or sending a written notice to an address—and that Mr. Cordero had not taken either action. *Id.* at 13–14. Finally, Goldman argued that all of the claims asserted in Mr. Cordero's complaint, including his federal statutory claims, fell within the scope of the Arbitration Provision. *Id.* at 14–17.

Following service of the reply, Plaintiff moved to compel limited discovery. Dkt. No. 73. Plaintiff requested that the Court compel Defendant to produce materials that were specific to his application for a Marcus account, including "the complete call transcript or audio recording of Plaintiff's January 7, 2025 call to Marcus . . . , any internal notes, correspondence, or CRM entries associated with Plaintiff's account application and onboarding process from January 7, 2025, [and] [a]ny screen capture, metadata, or audit log showing the steps taken by Plaintiff in the Marcus online application portal up to the point of the 'Please call us' screen display." *Id.* at 2–3. In part because

Goldman had based its motion solely on what Mr. Cordero "would have seen" and a fictitious workflow, rather than evidence of Mr. Cordero's actual interactions with its system, the Court granted Plaintiff's motion to compel and allowed Defendant to file a supplemental brief in connection with the discovery disclosed to Plaintiff. Dkt. No. 81 ("Discovery Order").

Defendant filed its supplemental reply on July 31, 2025. Dkt. No. 121 ("Supp. Reply"). Alongside that brief, Defendant filed the Third Anderson Declaration, along with several exhibits. *See generally* Third Anderson Decl. Defendant argued that the newly-produced evidence provided further proof that Mr. Cordero had manifested assent to the DAA. Supp. Reply at 2. Among other exhibits, Defendant filed a "true and correct copy of the webpages Plaintiff would have seen" during his onboarding. Third Anderson Decl. ¶¶ 6–7.[4] Goldman argued that the evidence more fully described the step-by-step process it asserted that Mr. Cordero undertook in creating his account, which terminated in a screen in which Goldman argues Mr. Cordero needed to manifest assent to the DAA prior to opening his account. *See* Supp. Reply at 2–3. Finally, Goldman argued that its internal records showed that Mr. Cordero logged in at a certain time and that he had accepted the agreements shortly after doing so, establishing that there was no dispute of material fact that Mr. Cordero had agreed to the DAA. Supp. Reply at 4–5; Third Anderson Decl. ¶ 8.

Having been granted leave by the Court, Mr. Cordero filed a sur-reply on September 6, 2025. Dkt. No. 135 ("Sur-reply"). Plaintiff first argued that Goldman's shifting accounts of the sign-up process, in particular its submission of a second set of exhibits Goldman asserts represented the webpages he would have seen supported an inference that neither set of exhibits were accurate. *Id.* at 3–5. Mr. Cordero then argued that his decision to plead alternative theories of liability did not constitute an admission that he assented to the DAA. *Id.* at 5–6. He also argued that his mention of

---

[4] Defendant conceded that their exemplar workflow submitted in connection with their first reply was not what Mr. Cordero would have seen, and that this new submission "more precisely reflects what Plaintiff would have seen." Supp. Reply at 5, n.7.

the DAA during the hearing held on April 25, 2025 also did not constitute an admission that he agreed to the DAA. *Id.* at 7–8.  Mr. Cordero also reprised his core argument:  that he never saw or agreed to the DAA, and Goldman's evidence does not satisfy their burden to demonstrate the absence of a genuine issue of material fact in the face of his categorical and unequivocal denial.  *Id.* at 8–10; *see also* Sur-reply Decl.  Mr. Cordero, after briefly raising his unconscionability, due process, and opt-out arguments, then argued that Goldman's conduct during this litigation merits denial of their motion.  Sur-reply at 10–18.  Finally, Mr. Cordero sought certification for interlocutory appeal should the Court grant Defendant's motion.  *Id.* at 18–20.

### iii.      Evidentiary Motions

Following Goldman's filing of its supplemental reply, Mr. Cordero filed multiple motions related to Goldman's discovery:  first, he sought to strike the Third Anderson Declaration and the attached exhibits and sought additional discovery, Dkt. No. 99; next, he filed a motion to exclude the Third Anderson Declaration and attached exhibits, Dkt. No. 102; finally, he moved to sanction Goldman for what he argued was noncompliance with the Court's discovery orders, Dkt. No. 106.  The Court denied the motion to strike, holding that it "[could] not find that Defendant's submissions [were] outside the scope of the requested production."  Dkt. No. 100 at 2.

Plaintiff moved to exclude the Third Anderson Declaration and the associated exhibits on August 5, 2025.  Dkt. No. 102.  He argued that Goldman had not established the authenticity of the exhibits under Federal Rule of Evidence 902.  *Id.* at 5–16.  He also argued that Ms. Anderson's affirmations could not establish authenticity under Federal Rule of Evidence 901 and 602 because Ms. Anderson does not have the requisite expertise to testify to technical matters and because her affirmations are "speculative."  *Id.* at 16–18.  Plaintiff argued that the productions violate the best evidence rule under Federal Rule of Evidence 1002.  *Id.* at 18–21.  Goldman filed its opposition on August 19, 2025.  Dkt. No. 118.  It argued that Ms. Anderson's testimony properly authenticated the

business records submitted alongside her declarations under Federal Rule of Evidence 901 and that the evidence did not violate the best evidence rule. *Id.*

On August 25, 2025, Mr. Cordero filed a reply. Mr. Cordero reprised each of his prior arguments but focused on his contention that Ms. Anderson was not qualified to testify to the evidence submitted alongside her declarations. Dkt. No. 132 at 2–3; 5–7; 12. He also raised arguments concerning "discovery violations," which the Court construes as arguments concerning the relevance of the exhibits under Federal Rules of Evidence 401, 402, and 403. *Id.* at 7–9.

Mr. Cordero moved to sanction Defendant for alleged failures to comply with the Court's discovery order on August 4, 2025. Dkt. No. 106.[5] Mr. Cordero's motion was premised on Goldman's alleged failure to provide two of the three categories of discovery ordered by the Court. *See generally id.* Mr. Cordero argued that Goldman was withholding relevant documents that he argued it was required to maintain pursuant to federal statutes and regulations. *Id.* at 9–10. In particular, he referred to Exhibits A, E, G, and to both the Second and Third Anderson Declarations as being nonresponsive to the discovery order. *Id.* at 13. He also argued that the materials were delivered as "an unlabeled, disorganized file dump," and that several exhibits "arrived in proprietary or unreadable formats." *Id.* at 6. He sought several forms of relief, including striking all of Goldman's evidence, or, in the alternative, denial of Defendant's motion. *Id.* at 13–14.

Goldman filed a brief in opposition on August 12, 2025. Dkt. No 115 ("Sanctions Opp."). Its central argument was that it produced the records it had in its possession and that it produced the data "in a form which it is ordinarily maintained or in a reasonably usable form or forms," and that its productions "complied with . . . and, in fact, exceed its obligations under the [Discovery Order]." *Id.* at 1–2, 5–6 (quotation omitted). Defendant also noted that Plaintiff had not sought to

---

[5] Though Mr. Cordero moved for sanctions several times, the Court understands these to be duplicate submissions. *See, e.g.*, Dkt. No. 108.

confer with counsel on any alternate forms of production. *Id.* at 5–6. Defendant finally argued that its productions included the metadata which Plaintiff argued was omitted. *Id.*

Mr. Cordero filed a reply on August 19, 2025. Dkt. No. 127. He once again asserted that Defendant's production of "database logs and internal status fields" was not responsive to the Court's discovery order. *Id.* at 5–6. He also argued that Defendant's productions were "misleading" because they reflected the actions of Goldman, rather than Mr. Cordero. *Id.* at 6–7. He then argued that the production of the exemplar workflows was unresponsive because it related to "third parties" rather than Mr. Cordero. *Id.* at 7–8. He repeated his argument that the file formats of the productions merit sanctions. *Id.* at 8–12. Arguing that the alleged conduct reflected Defendant's bad faith, Mr. Cordero argued that the only appropriate sanction was to deny the motion to compel arbitration in its entirety. *Id.* at 14–17.

### iv.      Motion to Seal

Alongside its supplemental reply, Goldman filed a letter motion to seal and an accompanying declaration of Ms. Anderson. Dkt. Nos. 94 ("First Sealing Mot."), 119 ("Second Sealing Mot."), 120 ("Anderson Sealing Decl.").[6] Goldman sought to seal one exhibit in its entirety and redact portions of others. Goldman argued that the proposed redactions reflected private and sensitive information or "confidential, propriety information," that "sophisticated fraudsters could [use to] exploit . . . vulnerabilities . . . ." Dkt. No. 119 at 2–3. Plaintiff filed an opposition to that motion to seal, arguing that Goldman had not overcome the presumption of public access to judicial documents and that Ms. Anderson was unqualified to speak to the security risks that Goldman argued would result from disclosure. *See generally* Dkt. No. 128. Defendant did not file a reply.

---

[6] Goldman first filed its motion to seal in connection with the filing of its supplemental reply brief. Dkt. No. 94. In a conference held on August 12, 2025, the Court indicated that it was not inclined to grant the motion as filed and set a deadline for Defendant to refile its application. Dkt. No. 116. Goldman refiled its application and limited its requests to seal. *Compare* Dkt. No. 94, *with* Dkt. No. 119.

### III.    LEGAL STANDARD

#### A.    Motion to Compel

Under Section 2 of the FAA, as a general matter, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." 9 U.S.C. § 2. "There are two types of validity challenges under § 2: 'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). "[O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Id.* "[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate. [A]s a matter of substantive federal arbitration law, an Arbitration Provision is severable from the remainder of the contract." *Id.* at 70–71 (second alteration in original) (internal quotation marks and citation omitted).

The FAA also provides that parties can petition the district court for an order compelling arbitration under 9 U.S.C. § 4. Section 4 of the FAA provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . .

9 U.S.C. § 4. A party has "refused to arbitrate" within the meaning of Section 4 if it "commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (citation and brackets omitted); *see also Jacobs v. USA Track & Field*, 374 F.3d 85, 89 (2d Cir. 2004) (finding no refusal to

arbitrate where respondents had not commenced litigation nor failed to comply with an order to arbitrate).

In order to determine whether an action should be sent to arbitration, courts in this Circuit engage in the following inquiry:

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998)).  "In deciding a motion to compel arbitration, 'the role of courts is limited to determining two issues:  i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate.'"  *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (quoting *LAIF X SPRL*, 390 F.3d at 198).

"It has long been settled that arbitration is a matter of contract and that, therefore, a party cannot be compelled to arbitrate issues that a party has not agreed to arbitrate."  *Isaacs v. OCE Bus. Services, Inc.*, 968 F. Supp. 2d 564, 567 (S.D.N.Y. 2013) (citations omitted).  "The question of whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  "This principle flows inexorably from the fact that arbitration is simply a matter of contract between the parties."  *Id.* (quotation and brackets omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that "arbitration is a matter of contract" (quotation omitted)); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (holding that, with respect to an arbitration agreement, "as with any other contract, the parties' intentions

control" (quotation omitted)).  Hence, "[t]he threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles."  *Nicosia*, 834 F.3d at 229 (citation omitted).

However, "[t]he Supreme Court has interpreted the FAA broadly, finding a 'liberal federal policy favoring arbitration agreements.'"  *Bynum v. Maplebear Inc.*, 160 F. Supp. 3d 527, 533 (E.D.N.Y. 2016) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (brackets omitted).  Furthermore, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25.

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citations omitted); *see also Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342–43 (S.D.N.Y. 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (quotation omitted)).  If the Court determines "that an arbitration agreement is valid and the claim before it is arbitrable, it must stay or dismiss further judicial proceedings and order the parties to arbitrate."  *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015) (quotation omitted).

"In deciding motions to compel, courts apply a 'standard similar to that applicable for a motion for summary judgment.'"  *Nicosia.*, 834 F.3d at 229 (citing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2011)).  "The summary judgment standard requires a court to 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to

interrogatories, and admissions on file, together with . . . affidavits.'" *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).  "In doing so, the court must draw all reasonable inferences in favor of the non-moving party." *Id.*  "'If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary.'" *Id.* (quoting *Bensadoun*, 316 F.3d at 175).  "'But where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund Ltd.*, 661 F.3d 164, 171–72 (2d Cir. 2011) (internal quotations omitted)).

A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  The non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

16

### B.      Motion for Rule 37 Sanctions

A district court has broad discretion to determine the appropriate sanctions for discovery abuses under both Rule 37 of the Federal Rules of Civil Procedure and its inherent powers. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009).

Rule 37 provides in pertinent part that

> If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.  They may include the following:
> (i)      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims.
> (ii)     prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii)    striking pleadings in whole or in part;
> (iv)    staying further proceedings until the order is obeyed;
> (v)     dismissing the action or proceeding in whole or in part;
> (vi)    rendering a default judgment against the disobedient party; or
> (vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  "Several factors may be useful in evaluating a district court's exercise of discretion" to impose sanctions pursuant to this rule, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (internal quotation marks and alteration omitted) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)).  These factors are not exclusive, however.  *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010).  And they need not each be resolved against the sanctioned party to fall within the scope of the district court's wide discretion in imposing sanctions. *Id.*

"[D]ismissal or default imposed pursuant to Rule 37 is a 'drastic remedy' generally to be used only when the district judge has considered lesser alternatives.  Despite the harshness of these

measures, however, 'discovery orders are meant to be followed,' and dismissal or default is justified if the district court finds that the failure to comply with discovery orders was due to 'willfulness, bad faith, or any fault' of the party sanctioned . . . ." *Id.* (citations omitted).

### C.    Motion to Seal

There is a long-established "general presumption in favor of public access to judicial documents." *Collado v. City of New York*, 193 F. Supp. 3d 286, 288 (S.D.N.Y. 2016). The Second Circuit has defined "judicial documents" as documents filed with a court that are "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quotation omitted); *see also Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 620–621 (S.D.N.Y. 2011). The presumption of access is "based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

"A qualified First Amendment right of access, 'understood to be stronger than its common law ancestor and counterpart,' also attaches to certain judicial documents." *United States v. Greenwood*, 145 F.4th 248, 255 (2d Cir. 2025) (citing *United States v. Erie Cnty., N.Y.*, 763 F.3d 235, 239 (2d Cir. 2014)). The Second Circuit has "emphasized that a document filed with the court is a judicial document if it would reasonably have the *tendency* to influence a district court's ruling . . . without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Id.* (citing *Olson v. Major League Baseball*, 29 F.4th 59, 89 (2d Cir. 2022)). "To determine whether the First Amendment right of access attaches to a judicial document, this Court 'considers the extent to which the judicial documents are derived from or are a necessary corollary of the capacity to attend the relevant proceedings.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120 (cleaned up)). "If the First Amendment right attaches, a court record may still be sealed if 'specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is

18

narrowly tailored to serve that interest.'" *Id.* (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) (quotation marks omitted)).

## IV.   DISCUSSION

The Court denies Goldman's motion to compel, denies Mr. Cordero's motion to exclude, denies his motion for sanctions, and grants in part and denies in part Goldman's motion to seal. As further described below, the consequence of the Court's ruling is that the Court must hold a trial on the issue of whether Mr. Cordero and Goldman entered an arbitral agreement. The Court addresses each set of pending motions in turn.

### A.   The Parties' Agreement

Considering the evidence proffered by the parties, the Court finds that there is a genuine issue of material fact as to whether the parties entered into an agreement with an enforceable arbitration clause that covers the scope of Plaintiff's claims. The Court must hold a trial to resolve this issue.[7] The Court does not rule on Mr. Cordero's challenges to the enforceability of the

---

[7] The Court denies Plaintiff's motion to exclude the exhibits attached to the Third Anderson Declaration because they are competent evidence. It is well established that the party moving to compel arbitration must demonstrate, by a preponderance of the evidence, that an agreement to arbitrate was made. *See Barrows.*, 36 F.4th at 50. Under this standard, the Court may only consider competent evidence. *See Sheldon v. Barre Belt Granite Employer Union Pension Fund*, 25 F.3d 74, 79 (2d Cir. 1994). Goldman's evidence is competent because it is relevant and properly authenticated. The exhibits submitted alongside Goldman's supplemental reply—considered individually and together—has some tendency to make it more probable that Mr. Cordero assented to the DAA and therefore did agree to arbitrate. Fed. R. Evid. 401. The exhibits have been properly authenticated. Ms. Anderson affirms that by virtue of her role at Goldman, she has "access to, and [she has] personally reviewed" the exhibits attached to her declaration. *Id.* ¶ 3. That is sufficient to properly authenticate the exhibits. *See Bennett v. Barclays Bank Delaware*, No. 24 CIV. 6549 (LGS), 2025 WL 2690390, at *2 (S.D.N.Y. Sept. 19, 2025). Finally, none of the exhibits violate the best evidence rule. Federal Rule of Evidence 1002 requires that an "original writing, recording, or photograph is required in order to prove its content." Fed. R. Evid. 1002. The rules define an "original" of electronically stored information to mean "any . . . other output readable by sight—if it accurately reflects the information." Fed. R. Evid. 1001(d). The exhibits are "readable by sight," and therefore fall within the scope of the rule. The Court will therefore consider the exhibits in connection with Goldman's motion to compel.

The Court denies without prejudice Mr. Cordero's motion to exclude these exhibits under Federal Rule of Evidence 403. While "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997), the Court need not resolve these questions because the evidence is competent for the Court to consider it in connection with Goldman's motion to compel arbitration. The parties may raise evidentiary objections in advance of trial, and the Court will consider those motions in a future pre-trial conference. *See* Fed. R. Civ. P. 16(e) (allowing court to hold a "final pretrial conference to . . . facilitate the admission of evidence" and requiring that conference to be held "as close to the start of trial as is reasonable.").

Arbitration Provision because there has not been a determination of whether a contract exists and the steps taken to adopt it if so, but the Court addresses some of the parties' arguments below.

### i. Formation of the Arbitrable Agreement

There is a genuine issue of material fact as to whether the parties entered a binding agreement to arbitrate. "It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* at 289. For web-based contracts, "an electronic click can suffice to signify the acceptance of a contract." *Meyer v. Uber Techs.*, 868 F.3d 66, 75 (2d Cir. 2017) (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016)). Goldman argues that Mr. Cordero assented to the DAA because he checked a box that indicated his agreement to the DAA during the sign-up process for his Marcus account. This is an example of a "clickwrap" or "click-through" agreement because the user must "click" after being presented with the agreement. *Id.*

Under New York[8] law, a "clickwrap" process can "satisfy the requirements for formation of an agreement to arbitrate." *Wu*, 43 N.Y.3d at 307. "[A] user does not need to have actually read

---

[8] Goldman seeks to apply Utah law to the question of contract formation. However, the cases it cites for this proposition are inapposite because they do not concern circumstances where, as here, the party resisting arbitration is arguing that there was never a valid contract containing an arbitration clause to begin with. In the cases they rely on, the party resisting arbitration had already conceded the existence of a contract. *See Aneke v. Am. Exp. Travel Related Servs., Inc.*, 841 F. Supp. 2d 368, 376 (D.D.C. 2012) (assuming applicability of the contract provision governing choice of law); *Khanna v. Am. Exp. Co.*, No. 11 CIV. 6245 JSR, 2011 WL 6382603, at *2 (S.D.N.Y. Dec. 14, 2011) ("The parties do not dispute that they agreed to arbitrate."). Here, Plaintiff argues that he never entered into the agreement in the first place. Opp. at 1. Goldman provided no further choice of law analysis.

and understood the terms of an internet contract to be . . . bound; rather, where a 'reasonably prudent user' would have been on inquiry notice of contractual terms, [that user] may still be bound by [those terms]." *Id.* at 303 (citing *Meyer*, 868 F.3d at 74–75). "A reasonably prudent user is one who is neither 'highly savvy' nor 'a complete stranger' to computers or smartphones—that is, someone who has general familiarity with how to navigate a website, use a scroll bar, recognize a hyperlink, and download an application." *Id.* (citing *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703–04 (2d Cir. 2023)). Whether such a user would be on inquiry notice of contractual terms is an "objective standard," the analysis of which may involve examining "'the design and content of the relevant interface to determine if the contract terms were presented to the [user] in [a] way that would put [them] on inquiry notice of such terms.'" *Id.* (citing *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)). "'[W]hen terms are linked on an uncluttered interface and temporally and spatially coupled with the mechanism for manifesting assent, and the user does not need to scroll beyond what is immediately visible to find the terms, courts have concluded, as a matter of law, that the interface provided reasonably conspicuous notice of the existence of contractual terms.'" *Id.* (citing *Edmundson*, 85 F.4th at 704). Finally, in addition to notice, "formation of a web-based contract under New York law also requires a clear and objective manifestation of assent." *Id.* (citing

---

"A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003)). "The New York Court of Appeals has held that 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Id.* (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993); citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309 (1994)). "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citations omitted).

There is no conflict between the states' laws that might apply, so the Court elects to apply New York Law. Plaintiff is a citizen of Oklahoma who opened an account with a New York-chartered Bank with a principal place of business in New York. Compl. ¶¶ 3–4. Courts in both states have upheld "clickwrap" as a method of obtaining assent if the agreement "gives a consumer reasonable notice of its terms and the consumer affirmatively manifests assent to the terms . . . ." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (construing Oklahoma law); *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288, 305–06 (2024) (describing clickwrap as "a means of acquiring binding assent from consumers that has been widely upheld by courts across the country," citing, among other cases, *Hancock*, 701 F.3d at 1256).

21

*Stonehill Capital Mgmt. LLC v. Bank of the W.*, 28 N.Y.2d 439, 448 (2016)). "Although an internet . . . user need not explicitly say 'I agree' to the contractual terms, they must engage in conduct that a reasonably prudent user would understand to constitute assent." *Id.* at 303–04 (citing *Edmundson*, 85 F.4th at 704–05). Further, "[i]t is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004).

There is a genuine dispute of material fact as to whether Mr. Cordero manifested assent to the DAA. "When moving to compel arbitration, the party seeking . . . arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows*, 36 F.4th at 50. In its motion papers, Goldman proffered the DAA and a declaration by Ms. Anderson affirming that Mr. Cordero "had to consent to the Deposit Account Agreement" and that Goldman "would not have opened [his] [a]ccount had [he] not accepted" the DAA. First Anderson Decl. ¶ 5. Accordingly, Mr. Cordero needed to "counter with at least some evidence . . . to substantiate [his] denial that an agreement had been made." *Barrows*, 36 F.4th at 50. He submitted an affidavit affirming that he did not sign the DAA and did not see any screen where he would have had to manifest assent to the DAA. *See* Opp. Aff.

Mr. Goldman's affidavit created a genuine issue of material fact. "There is nothing . . . to suggest that a nonmovant['s] affidavit[] alone cannot—as a matter of law—suffice to defend" against a motion to compel arbitration. *Barrows*, 36 F.4th at 50. "[T]he fact that a party's declaration can defeat a motion to compel arbitration does not mean it always will." *Id.* at 51. The Second Circuit has identified three cases where a nonmovant's declarant will not be sufficient to create a genuine issue of material fact: (1) "[w]here a party merely states that [he] cannot *recall* signing an agreement (as opposed to *denying* [he] has done so)," *id.* (emphasis in original); (2) "where 'the facts alleged' in a

22

nonmovant's declaration 'are so contradictory that doubt is cast upon their plausibility," *id.* (quoting

*Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2000); and (3) "in those *rare cases*

where [the nonmovant's declaration] is 'blatantly contradicted by the record, so that no reasonable

jury could believe it.'" *id.* (quoting *Scott v. Harris*, 550 U.S. 372, 308 (2005)) (emphasis added).  The

first two circumstances do not justify granting Goldman's motion to compel.  Mr. Cordero has

consistently, unequivocally, and categorically denied that he signed the DAA.  *See* Opp Aff. ¶ 3; Sur-

reply Decl. ¶¶ 26-29.[9]  Accordingly, to establish that there was no genuine dispute of material fact,

Goldman had the burden to demonstrate that this was the "rare case" where Mr. Cordero's

affidavits were so "blatantly contradicted by the record" that "no reasonable jury could believe

[them]."  Goldman has not met this burden.

Mr. Cordero submitted several affidavits.  Goldman's evidence in response contradicts Mr.

Cordero's, but not so "blatantly" that no reasonable jury could believe him.  That is particularly true

on this record, where Goldman's account of Mr. Cordero's sign-up process changed throughout the

course of the litigation of their motion to compel.  Goldman provided two varying accounts of Mr.

Cordero's sign-up process; a reasonable jury could choose not to credit Goldman's narrative on that

basis alone.  They first asserted that Mr. Cordero signed up by going through a set of webpages on

Goldman's website.  *See* Airpods Flow.  Following discovery, they sought to withdraw the exhibit

demonstrating that process as inaccurate and instead asserted that Mr. Cordero's sign-up process

involved a different set of webpages, as well as a phone call and email omitted from its prior

account.  *See* Supp. Reply.  Because Mr. Cordero has affirmed clearly that he did not assent to the

---

[9] The Court does not credit Goldman's arguments that Mr. Cordero conceded to signing the agreement either through his pleading in the alternative or through references to the agreement in oral argument.  As Mr. Cordero correctly notes, the Federal Rules of Civil Procedure allow for pleading in the alternative.  *See* Fed. R. Civ. P. 8(a)(3); *see also Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95 (2d Cir. 2022) (remanding to district court for factual proceedings regarding motion to compel arbitration where plaintiff alleged breach of contract).  For the same reason, Mr. Cordero's references to the deposit agreement do not foreclose his argument that he did not assent to the agreement.

DAA, and a reasonable jury need not credit Goldman's shifting narratives, Mr. Cordero is entitled to a trial on whether he entered into an agreement with an arbitration clause. *See Simmons v. SUNco Cap., LLC*, No. 24-CV-7129 (BMC), 2025 WL 711724, at *5 (E.D.N.Y. Mar. 5, 2025) ("Because plaintiff has provided some evidence that the . . . agreement containing the arbitration clause [defendant] seek[s] to enforce is void, [plaintiff] is entitled to a trial on whether [his] claims . . . are subject to arbitration").[10]

### ii.    Mr. Cordero's Defenses

The Court will not rule on the merits of Mr. Cordero's challenges to the enforceability of the arbitration provision at this time. It would be premature to do so because no determination has yet been made that a contract exists, or the specific steps used to adopt it, if so. Still, the Court will explain its views on several of the challenges given the parties' fulsome briefing and with the hope that even as dicta, the Court's commentary will help the parties narrow the scope of their dispute. Mr. Cordero argues that the Arbitration Provision is unenforceable because it is unconscionable. He also argues that the Court should deny the motion to compel arbitration because he opted out of arbitration by filing this lawsuit. Finally, he argues that the Court should not enforce the Arbitration Provision because he cannot vindicate his rights through arbitration. All three of these defenses depend on the existence of a contract as set forth in the DAA in the first instance, so the Court declines to decide the issues pending the outcome of the trial that the Court must hold on that threshold issue.

---

[10] In its supplemental briefing, Defendant does not address the standard for when a party's declaration is insufficient to create a genuine issue of material fact. *See generally* Supp. Reply. Instead, Defendant points to its evidence supporting the existence of assent to the contract and states that it "forecloses any dispute of material fact," without explaining why Plaintiff's consistent and categorical denial that he ever assented to the DAA does not create such a dispute. *Id.* at 6. Defendant's invocation of the federal policy favoring arbitration does not resolve the issue for which a dispute of material fact exists. The presumption of validity afforded to arbitration agreements, which requires courts to "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985), requires that the Court find that there is an agreement to enforce. Plaintiff's declaration creates a dispute of material fact of this threshold issue.

Nonetheless, the parties have fully briefed these issues.  Apart from the arguments concerning procedural unconscionability, these defenses depend on interpretations of the DAA, and "[a]s a general rule, the construction and interpretation of a contract is a question of law to be decided by the judge." *O'Hara v. Hall*, 628 P.2d 1289, 1290 (Utah 1981).  The Court therefore provides its views on the defenses below as non-binding dicta and expects that it will rely on the same reasoning to rule on the viability of Mr. Cordero's defenses should the outcome of the trial be that the parties did enter into an arbitral agreement.

As a threshold matter, the Court expects to hold that it can decide issues of arbitrability.  "It is a fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute that is subject to adjudication." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019).  However, "[t]he right of access to courts is of such importance that courts will retain authority over the question of arbitrability of the particular dispute unless 'the parties clearly and unmistakably provide[d]' that the question should go to arbitrators." *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  Thus, "to determine whether the issue of arbitrability of this dispute should be resolved by an arbitrator rather than the court, we must examine the parties' agreement to determine whether they clearly and unmistakably agreed to have that issue resolved by arbitrators." *Id.* at 191.

Here, the DAA not only fails to include any clear or unmistakable language evincing an intent to have an arbitrator resolve issues of arbitrability, the language of the agreement evinces the opposite intent.  The DAA's Arbitration Provision gives either party the right to "elect to resolve any Claim by individual binding arbitration." DAA at 17.  The agreement defines "Claim" within the meaning of the Arbitration Provision as "any current or future claim, dispute, or controversy relating in any way to this agreement or to your Accounts, *except for the validity, enforceability, or scope of the Arbitration Provision*." *Id.* at 16 (emphasis added).  Thus, if the factfinder determines that the

parties did enter a valid contract containing the Arbitration Provision, the Court expects to hold that it retains authority to decide questions of arbitrability.

### 1. Substantive Unconscionability

The Court expects to hold that the Arbitration Provision is not substantively unconscionable. The Supreme Court of Utah applies a two-pronged analysis to determine whether a contract's terms are unconscionable. *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998).[11] "The first prong—substantive unconscionability—focuses on the agreement's contents." *Id.* "The second prong—procedural unconscionability—focuses on the formation of the agreement." *Id.* "In determining substantive unconscionability, [Utah courts] consider whether a contract's terms are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain according to the mores and business practices of the time and place." *Id.* (internal quotations and modifications omitted).

The Arbitration Provision of the DAA is not substantively unconscionable. Mr. Cordero argues that the clause is substantively unconscionable because it limits discovery, bars class-wide actions, and otherwise imposes "one-sided burdens" and "preclude[s] effective relief." Opp. at 32. Neither of the first two features of the arbitration clause represent "oppression and unfair surprise." As discussed below, the DAA "contained a mechanism that allowed Plaintiff to opt-out of the arbitration clause—a provision [he] did not invoke." *Klein v. Experian Info. Sols., Inc.*, No. 19-CV-11156 (PMH), 2020 WL 6365766, at *7 (S.D.N.Y. Oct. 29, 2020) (applying Utah law). The Provision, by its terms, does not impose any one-sided burdens that render it unconscionable. In many cases, the agreement imposes additional burdens on Goldman, rather than the customer. *See, e.g.*, DAA at 17 ("We will pay any fees charged by JAMS or AAA in connection with any Claims.");

---

[11] While Mr. Cordero cites cases interpreting New York law in his argument concerning interpretation of the opt-out provision, the DAA provides a choice-of-law provision stating that Utah law applies. *See* DAA at 15.

*id.* (providing that Goldman will, in certain circumstances, pay to a customer victorious in arbitration "twice the amount of your reasonable attorneys' fees or the amount of attorneys' fees to which you are entitled under applicable law, whichever is greater"). Accordingly, should the outcome of the trial be that Mr. Cordero and Goldman entered into an agreement as set forth in the DAA—inclusive of its Arbitration Provision—the Court expects to hold that the Arbitration Provision is not substantively unconscionable.[12]

### 2. Opt-out

The Court expects to hold that Mr. Cordero did not opt out of arbitration by filing this lawsuit because the DAA unambiguously provides for only two ways to opt out of arbitration: calling or mailing. "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Daines v. Vincent*, 190 P.3d 1269, 1275 (Utah 2008) (citations and internal quotations omitted). "[C]ontractual ambiguity can occur in two different contexts: (1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties." *Id.* at 1275–76 (citation omitted). "The first context presents a question of law to be determined by the judge." *Id.* at 1276. The Supreme Court of Utah has set forth a "two-part standard for determining facial ambiguity." *Id.* First, "'when determining whether a contract is ambiguous, any relevant evidence must be considered. Otherwise, the determination of ambiguity is inherently one-sided, namely, it is based solely on the extrinsic evidence of the judge's own linguistic education and experience.'" *Id.* (quoting *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995)). "Second, after a judge considers relevant and credible evidence of contrary interpretations,

---

[12] While the Court does not decide the issue of procedural unconscionability because procedural unconscionability require the Court to assume the "formation of an agreement"—the same issue for which the Court must hold a trial—the Court observes that "procedural unconscionability by itself will 'rarely render[ ] a contract unconscionable.'" *Klein*, 2020 WL 6365766, at *5 (quoting *Knight Adjustment Bureau v. Lewis*, 228 P. 3d 754, 757 n.4 (Utah 2010)).

the judge must ensure that 'the interpretations contended for are reasonably supported by the language of the contract.'" *Id.* (quoting *Ward*, 907 P.2d at 268). "[A] finding of ambiguity after a review of relevant, extrinsic evidence is appropriate only when 'reasonably supported by the language of the contract.'" *Id.* (citing *Ward*, 907 P.2d at 268).

The DAA's arbitration opt-out provision is not ambiguous. Mr. Cordero argues that the contract is facially ambiguous because the opt-out provision uses what he argues is permissive language in connection with two enumerated methods of opting out of the Arbitration Provision. The provision of the DAA that Mr. Cordero refers to reads:

> **Arbitration Opt-Out; Your Right to Reject Arbitration:** You *may* reject this Arbitration Provision by calling us at 1-855-730-7283, or writing us at Goldman Sachs Bank USA, PO Box 70379, Philadelphia, PA 19176 and stating the following in your notice (a "**Rejection Notice**"): (i) your name, (ii) your address, (iii) your phone number, (iv) that you are exercising your right to reject arbitration under this subsection, and (v) the Account numbers for which you are exercising your right. Your Rejection Notice must be received within 90 days after opening the Account for which you are exercising your right to reject arbitration. *If* your Rejection Notice complies with these requirements, the Arbitration Provision in this Agreement will not apply to any Accounts in which you exercised your right. Your Rejection Notice will not apply to any claims subject to pending litigation or arbitration at the time you send your notice. Rejection of the Arbitration Provision will not affect your other rights or responsibilities under Section XI of this Agreement.

DAA at 18 (emphasis added). Mr. Cordero's argument centers on an interpretation of the word "may" in the first sentence. He argues that "may" implies that there are other, unenumerated ways a customer might opt out of arbitration—including by filing a lawsuit.

Mr. Cordero's interpretation of the word "may" is not reasonably supported by the language of the contract. Mr. Cordero suggests that "may" means that calling or mailing are two of many possible ways to opt out that are not enumerated. Read in context of the remainder of the DAA, the only plausible reading of the word "may" is that it reflects the accountholder's option to opt-out, not that there are methods other than the two enumerated ones by which an accountholder can

28

exercise that option.  On the very first page of the contract, the DAA states that claims are

"*require[d]* to be arbitrated . . . *unless* you exercise your right to reject arbitration under Section XII.5

*by phone or mail* within ninety (90) days after account opening."  DAA at 1 (emphases added).  On the

page prior to the opt-out provision—in the final subsection of the section titled "Arbitration"—the

DAA cautions the customer:

> Please note that if you do not want this Arbitration Provision to
> apply to you, *you must opt-out as provided below.* Even if you have
> previously opted-out of arbitration for a different product or service
> offered by Goldman Sachs Bank USA, you must separately opt out
> of this Arbitration Provision if you do not want it to apply to you
> because Goldman Sachs Bank USA manages your arbitration opt-out
> at the product or service level.

DAA at 17 (emphasis added).  Because the agreement makes it clear that the accountholder must

arbitrate his claims and specifies opt-out as the only mechanism to avoid arbitration, "may" is not

suggesting the option to opt-out by methods not enumerated; it is instead clarifying the option to

opt-out if the accountholder wishes to avoid the otherwise mandatory arbitration.  By the terms of

the agreement, only one interpretation of "may" is reasonably supported:  the DAA provided for

two, specific ways of opting out of the agreement, neither of which were satisfied by the filing of

this lawsuit.

Even assuming that the filing of a lawsuit was a permissible method of opting out of the

Arbitration Provision, the Court expects to hold that Mr. Cordero did not opt out by filing this

lawsuit.  Mr. Cordero does not dispute that a Rejection Notice requires five categories of

information.  DAA at 18.  His complaint only includes the first three categories of information but

does not include the last two.  *See generally* Amended Compl.  Mr. Cordero also does not dispute that

the DAA requires that any notice "must be *received* within 90 days after opening the Account for

which you are exercising your right to reject arbitration."  DAA at 18.  Mr. Cordero filed this lawsuit

on April 3, 2025, and requested permission to proceed *in forma pauperis* on that same day.  Dkt. No.

29

2. Mr. Cordero does not argue that he provided notice to Goldman between then and when the 90-day period expired on April 7, 2025, Opp. at 2, and the record indicates that the summons issued after the deadline on April 11, 2025, Dkt. No. 13. Accordingly, under any interpretation of the DAA, the Court expects that it will hold that Mr. Cordero did not opt out by filing this lawsuit.

### 3. Effective Vindication

The Court expects that it will not decline to enforce the Arbitration Provision under the doctrine of effective vindication. "[T]he 'effective vindication' doctrine is a judge-made exception to the FAA that invalidates, 'on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies.'" *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 89 (2d Cir. 2024) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013)). "The exception . . . stems from the principle that other federal statutes are on equal footing with the FAA." *Id.* at 89–90. "Although the Supreme Court has so far declined to apply the effective vindication exception in any case before it, it has repeatedly reaffirmed the existence of the exception." *Id.* at 90. Most recently in *Italian Colors*, the Supreme Court "explain[ed] that the exception 'would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights' and 'would perhaps cover filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable.'" *Id.* (citing *Italian Colors Rest.*, 570 U.S. at 236).

This is not one of the "rare cases where an arbitration agreement prevents [Plaintiff] from effectively vindicating [his] statutory rights." *Id.* at 91 (internal quotations and brackets omitted). The terms of the Arbitration Provision define "claim" to encompass any claim that is based on, among other bases, any "statute." DAA at 16. The agreement states that "the arbitrator may award

any relief available in court." *Id.* at 17.[13]  While the arbitrator would not be able to carry out the same functions as a banking regulator, this does not implicate the effective vindication exception because the Court also does not carry out those functions.  Nor does the agreement impose financial or procedural barriers that are so high as to render access to arbitration impracticable.  Instead, the agreement imposes on Goldman the obligation to pay JAMS or AAA fees.  *Id.* at 17.  Thus, the Court expects to hold that the exception does not apply should the factfinder determine that the parties agreed to the Arbitration Provision.

Mr. Cordero's argument that private arbitration does not effectively vindicate his federal statutory rights because it limits discovery and because it allows Goldman to evade public oversight misapprehends both the effective vindication exception and the Court's power in this case.  While the exception does cover cases where there are procedural barriers to arbitration, the limitations on discovery inherent to arbitration do not render access to relief in arbitration proceedings "impracticable."  *State Farm Mutual*, 120 F.4th at 90.  To the contrary, the Arbitration Provision does not impose any specific limitation on discovery and only states the unremarkable proposition that discovery in arbitration proceedings is "more limited" than it might be in court.  DAA at 17; *see also Kellner v. Amazon*, No. 22-734, 2023 WL 2230288, at *2 (2d Cir. Feb. 27, 2023) ("The rules governing the parties' arbitration authorized the arbitrator to 'require the parties, in response to reasonable document request, to make available to the other party documents' in their control that were 'not otherwise readily available' to the party seeking the documents, 'reasonably believed . . . to be relevant and material to the outcome of the disputed issues.'" (quoting AAA Commercial Arbitration Rules and Mediation Procedures, Rule 22(b)(iii) (2013))).  Such an observation does not render the Arbitration Provision unreasonable under the effective vindication

---

[13] At this time, the Court takes no position on whether Mr. Cordero has Article III standing to pursue his federal statutory claims.

exception.  *Cf. Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 418–19 (E.D.N.Y. 2014) (holding that arbitration provision's limitation on discovery prevented nonmovant from "effectively vindicating its rights" when the provision stated that "the right to discovery and the right to appeal are limited or eliminated by arbitration.  All of these rights are waived and disputes must be resolved through arbitration.").

For avoidance of doubt, the Court's views on Mr. Cordero's challenges to the enforceability of the Arbitration Provision are not binding and only reflect the Court's evaluation of the parties' arguments presented thus far in briefing.  The Court will reserve ruling on these challenges, and will only rule should the factfinder determine that the parties entered into an arbitration agreement.

### B.    Motion for Sanctions

The Court denies Plaintiff's motion to sanction Defendant for alleged violations of its discovery obligations.  The Court's discovery order required Goldman to produce three categories of discovery sought by Plaintiff:  (1) "the complete call transcript or audio recording of Plaintiff's January 7, 2025 call to Marcus Customer Service;" (2) "internal notes, correspondence, or CRM [Customer Relations Management] entries associated with Plaintiff's account application and onboarding process from January 7, 2025;" and (3) "any screen capture, metadata, or audit log showing the steps taken by Plaintiff in the Marcus online application portal."  Discovery Order at 1, n.1.  The parties do not disagree that Goldman produced the first category, as reflected in Exhibits B and C.[14]  Mr. Cordero argues that the remainder of the exhibits are nonresponsive, and that Goldman has intentionally withheld other, responsive documents, and that Goldman produced documents in an improper, difficult-to-parse format.  The Court cannot find that Goldman either withheld documents or that it produced documents in an improper format.

---

[14] The nomenclature used to identify exhibits in this opinion is the nomenclature used by the parties and as reflected in the Third Anderson Declaration.

The Court cannot find that Goldman failed to comply with its discovery order by withholding documents. "The moving party [seeking sanctions under Rule 37] bears the burden of showing that its adversary failed timely to disclose information required by Rule 26." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007). "To meet this burden, the moving party must establish '(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Id.* (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2006)). The first element requires showing that nonmoving party "breached its obligations . . . as provided in court orders regulating discovery." *Id.* "Although litigants commonly suspect that they are not getting all the documents they have requested and that an adversary is holding something back, and while such suspicions, on their own, do not ordinarily support the entry of discovery orders against the responding party, a different analysis applies when the requesting party identifies specific evidence to call into question the responding party's contention that no further responsive documents exist." *Lively v. Wayfarer Studios LLC*, No. 24-CV-10049 (LJL), 2025 WL 2463633, at \*2 (S.D.N.Y. Aug. 27, 2025) (internal quotations and citations omitted).

Mr. Cordero has not met his burden to demonstrate that Goldman has withheld relevant documents. Rule 26 of Federal Rules of Civil Procedure requires that discovery responses must be signed by an attorney certifying that it is consistent with the Federal Rules of Civil Procedure, including the rule authorizing the Court to order expedited discovery. *See* Fed. R. Civ. P. 26(g)(1)(B); *see also* Fed. R. Civ. P. 26(d). Goldman represents that it responded to the discovery order by making productions of documents "bearing bates stamp numbers ROMERO000001– ROMERO000011" on July 21, 2025 and July 24, 2025 and that it has "complied with . . . and, in

33

fact, exceeded its obligations under the Court's Order [compelling production of documents]." *See* Sanctions Opp. at 1–2.[15] Accordingly, Goldman represents that it served discovery productions with a certification stating the production is consistent with the Court's discovery order. Ms. Anderson also affirmed that the exhibits filed alongside her declaration—which Goldman represents are "the documents produced," *id.*—reflect "the account history and records of GS Bank related to the deposit account of Michael Cordero Romero." Third Anderson Decl. ¶ 3.

Mr. Cordero has not provided any evidence to overcome Goldman's representation that its productions of documents complied with its obligations. He asserts that Goldman is withholding evidence because he argues that Goldman is required to maintain, pursuant to federal banking statutes and regulations, documents that are relevant to the motion to compel arbitration. Mr. Cordero cites the Bank Secrecy Act, 35 U.S.C. § 5311 *et seq.*, the Sarbanes-Oxley Act, 15 U.S.C. § 7241, *et seq.*, and unspecified "Office of the Comptroller of the Currency (OCC) regulations governing operational integrity and documentation retention for federally regulated banking institutions." *See* Dkt. No. 106. However, Mr. Cordero does not proffer any specific evidence to call into question Goldman's representation that they complied with the discovery order. His assertion that Goldman did not comply is therefore only supported by speculation based on his own interpretation of certain statutes and regulations. *See Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 436 (S.D.N.Y. 2011). Accordingly, Mr. Cordero has not met his burden to demonstrate that Goldman withheld documents.

Mr. Cordero has also not shown that Goldman failed to comply with its discovery obligations by producing documents in an improper format. Federal Rule of Civil Procedure 34 requires that a party producing electronically stored information produce documents "as they are

---

[15] Goldman misrepresents the Court's prior order in response to the motion to strike. Dkt. No. 100. The Court did not "observe" that Goldman had "indisputably complied with" its prior order by producing all documents it had been ordered to produce, but only held that the exhibits were not "outside the scope of the requested production." *Id.* at 2.

kept in the usual course of business," "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms[.]" Fed. R. Civ. P. 34(b)(2)(E). The second requirement applies unless the request "specifi[es] [another] form for producing electronically stored information." Fed. R. Civ. P. 34(b)(2)(E)(ii). Goldman's productions complied with this obligation. Goldman represents—and Mr. Cordero does not dispute—that Plaintiff did not request the productions in a particular format. Goldman represents that it produced the records "as it maintains [them] in the ordinary course of its business." Sanctions Opp. at 5. Goldman also represents that it produced six categories of documents, four of which were produced in their "native format," and all of which were produced as image files and text files. *Id.* at 2–3. The productions also included twenty-six metadata fields. *Id.* Goldman therefore either produced files as they are "ordinarily maintained"— *i.e.*, as native files—or in a "reasonably usable form"—as image and text files. Accordingly, the Court does not find reason to impose sanctions on Goldman either for withholding responsive documents or for producing files in an improper format.

### C.    Motion to Seal

Goldman's motion to seal is granted in part and denied in part. The First Amendment right of access attaches to the exhibits Goldman submits alongside its motion to compel arbitration. As a threshold matter, the exhibits are judicial documents. "[The Second Circuit has] emphasized that a document filed with the court is a judicial document if it would reasonably have the *tendency* to influence a district court's ruling . . . without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Olson*, 29 F.4th at 89 (quotation marks omitted). These judicial documents are ones to which the First Amendment right of access attaches. The Second Circuit has held that, as a necessary corollary to the First Amendment presumption of access to oral arguments, "there exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment

motion." *Lugosch*, 435 F.3d at 124. As described above, the Court must apply a "standard similar to that applicable for a motion for summary judgment" to decide a motion to compel. *Nicosia*, 834 F.3d at 229. Indeed, just as in the summary judgment context, "[i]f there is an issue of fact" that cannot be resolved on the parties' submissions, "then a trial is necessary." *Id.* Accordingly, the exhibits submitted alongside Goldman's papers seeking to establish that the parties did agree to arbitrate implicate the First Amendment.

The Court can only make the necessary findings to grant Goldman's request in part. Sealing of these exhibits "must be justified by 'specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim.'" *Greenwood*, 145 F.4th at 256 (quoting *Lugosch*, 435 F.3d at 124). "Broad and general findings . . . are not sufficient to justify [sealing]." *In re N.Y. Times Co.*, 828 F.2d at 116. "Higher values that may justify redactions include the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure, as well as financial records, family affairs, illnesses, and embarrassing conduct with no public ramifications." *Greenwood*, 145 F.4th at 256 (citing *Amodeo*, 71 F.3d at 1051 (internal quotations, citations, and modifications omitted)). As described in more detail below, the Court grants Goldman's request to redact Exhibits B, C, D, and F, denies in part its proposed redactions to Exhibit G, and denies in full its request to seal Exhibit A.

### i. Exhibit A

The Court orders Goldman to file an unsealed version of Exhibit A with limited redactions. Goldman's argument that the document is confidential and propriety and may reveal information about its relationship with a third-party vendor cannot justify the request to seal the entire document. Goldman relies heavily on this exhibit in arguing that Mr. Cordero assented to the DAA and has placed much of this document on the public docket. *See* Supp. Reply at 5. Therefore, at least the portion Goldman disclosed must be filed in any redacted version. As to the remainder of

the document, Goldman argues that the document potentially creates a risk that a "sophisticated fraudster[] could identify [that third party] and exploit known vulnerabilities . . . as an alternative means to infiltrate" Goldman's systems.  Second Sealing Mot. at 3; *see also* Anderson Sealing Decl. ¶ 5.  The Court cannot make the necessary findings to support sealing the document.  Goldman has offered few specific facts to support its theory of harm, much less revealing how the information Goldman did not already disclose would not already lead to that harm.  The Anderson Declaration does not "make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection . . . ."  *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 630 (S.D.N.Y. 2011) (internal quotation omitted).  However, the Court observes that at least some of Exhibit A appears to include private information referring to nonparties.  Accordingly, the Court orders Goldman to file an unsealed version of Exhibit A with limited redactions.  Goldman must file also supplemental briefing justifying its proposed redactions.  As described in further detail below, the Court expects that it will accept proposed redactions that protect the privacy interests of Mr. Cordero or third parties or protect against potential competitive harm.

### ii.   Exhibits B, C, D, and G

The Court grants Goldman's request to redact portions of Exhibits B, C, and D.  The Court finds that Goldman has provided a factual basis for its assertion that revealing the redacted portions of Exhibit B could harm third parties not before the Court by providing malevolent actors the information needed to impersonate customers.  Anderson Sealing Decl. ¶ 6.  Such third-party privacy interests are proper countervailing considerations in deciding whether a party has met its burden to demonstrate that the presumption of public access to judicial documents has been overcome.  *GSC Logistics, Inc. v. Amazon.com Servs. LLC*, No. 23-CV-5368 (JGLC), 2023 WL 4993644, at *5 (S.D.N.Y. Aug. 4, 2023) ("Higher values that may justify the sealing or redaction of documents include . . . the privacy interests of third parties.").  Exhibits C and D also contain limited

redactions of personally identifiable information which are not relevant to the dispute before the Court. Accordingly, the Court grants Goldman's request to redact Exhibits B, C, and D.

Though the Court denies Goldman's request to redact the proposed portions of Exhibit G in full, the Court only orders that Goldman file a version with proposed redactions accounting for Mr. Cordero's public disclosure of portions of this exhibit. Mr. Cordero, in moving to exclude Exhibit G, places portions of that exhibit on the public record. *See* Dkt. No. 132 at 8. However, Goldman has provided a sufficient factual basis as to how a third party could use the information contained in the exhibit to manipulate Goldman's security protocols and access and use the information of third parties not before the Court. Anderson Sealing Decl. ¶ 8. Accordingly, the Court orders Goldman to propose redactions reflecting the information that has already been disclosed on the record. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015).

### iii.   Exhibit F

The Court grants Goldman's request to redact portions of Exhibit F. The Court finds that Goldman has provided a factual basis for the harm to Goldman and third-party customers that would result from disclosure of the information Goldman seeks to redact. Anderson Sealing Decl. ¶ 7. Goldman seeks to redact much of the document, except for a portion it asserts demonstrates that Mr. Cordero logged into his account at a certain time. Goldman argues that revealing the redacted portion would give competitors a "roadmap for the implementation of a sophisticated systems management program into which [Goldman] invested significant time and resources to develop." *Id.* Goldman also asserts that fraudsters could use the information to defraud its customers. *Id.* As discussed above, third-party privacy interests are cognizable considerations that may overcome the public's interest in access to judicial documents. The potential competitive harm from revelation of sensitive technical information is another such consideration. *See, e.g., JMG*

*Improvements, Inc. v. Arch Specialty Ins. Co.*, No. 20-cv-2882 (RAG) (WG), 2021 WL 3173022, at *2 (S.D.N.Y. July 26, 2021) (concluding that excerpts from "confidential and proprietary" business document could be filed under seal and crediting party seeking to seal's representation that disclosure would allow a competitor "seek[ing] to duplicate or reconstruct" the document to do so); *Avocent Redmond Corp. v. Raritan Americas, Inc.*, No. 10 CIV. 6100 PKC, 2012 WL 3114855, at *16 (S.D.N.Y. July 31, 2012) ("The parties may file the following documents under seal because they include engineering schematics, confidential source code and confidential deliberations about future products, the disclosure of which could unfairly allow competitors to develop competing products . . . "). Accordingly, the Court grants Goldman's request to redact Exhibit F.

## V.    CONCLUSION

For the foregoing reasons, the Court denies the motion to compel arbitration. The Court denies Plaintiff's motion to exclude without prejudice to a separate motion in limine in advance of the trial the Court must hold and denies his motion for sanctions. The Court grants in part and denies in part the motion to seal and orders Goldman to propose redactions to Exhibits A and G as specified above.

The Court will hold a trial on the issue of whether the parties entered into a valid arbitration agreement. That trial will be held in Courtroom 12C of the United States District Court for the Southern District of New York, Daniel Patrick Moynihan U.S. Courthouse at 500 Pearl Street, New York, New York, 10007. The parties are directed to jointly file a letter with the Court no later than one week following the entry of this order regarding their views on whether they are willing to waive their right to a trial by jury and the anticipated length of the trial. The Court will schedule a conference for a date following the expected date of receipt of the parties' materials to set a date for the trial and to set deadlines for pretrial submissions.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order

39

would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Court requests that counsel for Defendant provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.  The Clerk of Court is directed to terminate all pending motions.

SO ORDERED.

Dated:  January 27, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge